# Legal Effect of Federal Judge's Order as Hearing Officer Under Court's Employment Dispute Resolution Plan

The Chief Judge of the U.S. Court of Appeals for the Ninth Circuit, who was acting in an administrative capacity under the Court's employment dispute resolution plan when he issued an order to the Office of Personnel Management, lacked the authority to direct OPM in its administration of the Federal Employees Health Benefits Program. Accordingly, OPM is not legally required to comply with the directives in the order.

January 20, 2010

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF PERSONNEL MANAGEMENT

On November 19, 2009, Chief Judge Alex Kozinski of the U.S. Court of Appeals for the Ninth Circuit, acting as a hearing officer under the circuit's employment dispute resolution ("EDR") plan, issued an order ("November 19, 2009 Order") that, among other things, purported to direct the Office of Personnel Management ("OPM") to take or refrain from taking certain actions with respect to a circuit employee's efforts to enroll her same-sex spouse in the Federal Employees Health Benefits Program ("FEHBP"). *See In re Golinski*, 587 F.3d 956, 963–64 (9th Cir. 2009). You have asked whether OPM, which was not a party to the underlying EDR proceeding, must comply with those directives. This memorandum memorializes and further explains the prior advice our Office provided to you on this question. *See* E-mail for Elaine Kaplan, General Counsel, Office of Personnel Management, from David Barron, Acting Assistant Attorney General, Office of Legal Counsel (Dec. 16, 2009, 17:37 EST). As we advised, Chief Judge Kozinski, who was acting in an administrative capacity under the EDR plan when he issued the November 19, 2009 Order, lacked the authority to direct OPM in its administration of the FEHBP. Accordingly, OPM is not legally required to comply with the directives in the November 19, 2009 Order.[1]

---

[1] In a separate memorandum, we address whether OPM has the legal authority to direct the circuit employee's health insurance carrier not to enroll her same-sex spouse in the FEHBP and, if so, whether federal law nonetheless affords OPM the discretion to permit the enrollment to proceed. *See Authority of OPM to Direct FEHB Program Carrier Not to Enroll Individual Deemed Eligible by Employing Agency*, 34 Op. O.L.C. 51 (2010).

## I.

In 1998, the Judicial Council of the Ninth Circuit approved an EDR plan that grants circuit employees certain substantive rights and sets out a procedure for the enforcement of those rights. *See* U.S. Court of Appeals for the Ninth Circuit, Employment Dispute Resolution Plan (rev. ed. 2000) ("Ninth Circuit EDR Plan"). The plan prohibits, among other things, "[d]iscrimination against employees based on . . . sex . . . and sexual orientation," and it also incorporates the rights and protections afforded under the Ninth Circuit Equal Employment Opportunity ("EEO") plan. *Id.* at 2. In addition, the plan sets forth a detailed administrative process for the resolution of employment disputes involving circuit employees. *See id.* at 1 ("Claims arising under this Plan or the EEO Plan shall be treated in accordance with the procedures set forth in this Plan."). An employee who wishes to press a grievance must first participate in mandatory counseling and mediation. *Id.* at 5–7. If the grievance still remains unresolved, the employee may file a formal written complaint with the chief judge of the relevant court. *Id.* at 7. The respondent identified in the complaint must in all cases be "the employing office that would be responsible for redressing, correcting or abating the violations(s) alleged in the complaint." *Id.* For complaints that are not frivolous, the chief judge or his designee must hold a hearing on the merits and "may provide for such discovery and investigation as is necessary." *Id.* at 8. In the event that the presiding officer finds a violation of a substantive right protected by the plan, he may award "a necessary and appropriate remedy," including placement of the aggrieved individual in a particular position of employment, reinstatement of the individual to a position previously occupied, and relief under the Back Pay Act, 5 U.S.C. § 5596 (2006). Ninth Circuit EDR Plan at 9–10. "A party or individual" dissatisfied with the final decision may petition the Judicial Council of the Ninth Circuit for review. *Id.* at 9.

Karen Golinski, a staff attorney for the Ninth Circuit Court of Appeals, filed a complaint under this plan alleging that she had been the victim of discrimination based on sex and sexual orientation in violation of both the EDR plan itself and the incorporated EEO plan. *See Golinski*, 587 F.3d 901, 902 (9th Cir. 2009). Specifically, Ms. Golinski challenged the refusal of the Director of the Administrative Office of the United States Courts

("AOUSC") to certify that Ms. Golinski's same-sex spouse was a family member entitled to benefits under her FEHBP plan. *See id*. The first order issued in this dispute, on January 13, 2009 ("January 13, 2009 Order"), explained that the Director refused certification because he thought it barred as a result of the Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7 (2006), which requires federal agencies to construe any use of the word "spouse" in a federal statute to mean "a person of the opposite sex who is a husband or a wife." *Id.*; *see Golinski*, 587 F.3d at 902. In the Director's view, the statute governing the FEHBP, the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. §§ 8901–8914 (2006), when read in light of DOMA, did not permit OPM to contract with an insurance carrier for a health benefits plan covering an employee's same-sex spouse. *See Golinski*, 587 F.3d at 902; *see also* 5 U.S.C. §§ 8901(5), 8903(1), 8905(a). This conclusion was consistent with OPM's prior guidance to agencies that, as a consequence of DOMA, "same-sex marriages cannot be recognized for benefit entitlement purposes under . . . [the FEHBP]." OPM, Benefits Administration Letter No. 96-111, at 3 (Nov. 15, 1996) ("1996 Benefits Administration Letter").

The January 13, 2009 Order disagreed with the Director's conclusion. The Order construed the FEHBA, even as effectively amended by DOMA, to permit OPM to contract for health benefits for the same-sex spouses of government employees. *See Golinski*, 587 F.3d at 902–04. The Order further concluded that the denial of health insurance to Ms. Golinski's spouse violated the Ninth Circuit EEO plan (and, presumably, the Ninth Circuit EDR Plan as well). *See id.* at 903. To remedy the violation, the Order directed the Director to submit Ms. Golinski's health benefits election form "to the appropriate health insurance carrier," and further directed that "future health benefit forms are also to be processed without regard to the sex of a listed spouse." *Id.* at 904.

In compliance with the January 13, 2009 Order, the AOUSC submitted Ms. Golinski's election form to her health insurance plan, the Blue Cross and Blue Shield Service Benefit Plan ("Blue Cross Plan"). *See Golinski*, 587 F.3d at 958. Subsequently, OPM sent a letter to the AOUSC describing federal statutory requirements and the 1996 Benefits Administration Letter, and explaining that "[o]fficials of agencies participating in the Federal benefits programs administered by OPM must follow the guidance provided in [OPM's benefits administration letters]." Letter for

Nancy E. Ward, Deputy Assistant Director, Office of Human Resources, Administrative Office of the United States Courts, from Lorraine E. Dettman, Assistant Director, Insurance Services Programs, Office of Personnel Management at 1 (Feb. 20, 2009) ("AOUSC Letter"); *see also Golinski*, 587 F.3d at 958. The AOUSC Letter further explained that OPM had advised the Blue Cross Plan and another health plan that they could not accept enrollment forms submitted by the AOUSC for coverage barred by federal law. *See* AOUSC Letter at 2. OPM also sent a letter to the Blue Cross and Blue Shield Association, the carrier for the Blue Cross Plan, advising it that federal law barred the Plan from accepting Ms. Golinski's election form. *See* Letter for Stephen W. Gammarino, Senior Vice President, National Programs, Blue Cross and Blue Shield Association, from Shirley R. Patterson, Chief Insurance Contracting Officer, Office of Insurance Services Programs, Office of Personnel Management (Feb. 23, 2009) ("Blue Cross Letter"); *see also Golinski*, 587 F.3d at 958. Following these actions, Ms. Golinski sought further relief from Chief Judge Kozinski.

The November 19, 2009 Order concluded that OPM had "thwart[ed] the relief . . . ordered [in the January 13, 2009 Order]," *Golinski*, 587 F.3d at 958, and that Ms. Golinski was entitled to, *inter alia*, prospective relief that would enable her spouse to enroll in her FEHBP plan, *see id.* at 960–61. The November 19, 2009 Order expressed the view that an EDR hearing officer's "authority to order such relief is clear under the language of the EDR plan" and was intended by Congress. *Id.* at 961. In addition, asserting that "OPM's actions implicate . . . the autonomy and independence of the Judiciary as a co-equal branch of government," *id.*, the Order declared that "an EDR tribunal's reasonable interpretation of a law applied to judicial employees must displace, for purposes of those employees, any contrary interpretation by an agency or officer of the Executive," *id.* at 963. The Order went on to direct the AOUSC to resubmit within 30 days Ms. Golinski's election form to the Blue Cross Plan and to reiterate that the AOUSC was to process benefit forms "without regard to the sex of the listed spouse." *Id.* The Order also directed OPM to "rescind" within 30 days its "guidance or directive" explaining to the Blue Cross Plan "and any other plan" that "Ms. Golinski's wife is not eligible to be enrolled as her spouse under the terms of the [FEHBP] because of her sex or sexual orientation, and that the plans would violate their contracts with OPM by

enrolling Ms. Golinski's wife as a beneficiary." *Id.* Finally, the Order directed OPM "to cease at once its interference with the jurisdiction of this tribunal" and, specifically, not to "advise [the Blue Cross Plan] that providing coverage for Ms. Golinski's wife violates DOMA or any other federal law" and not to "interfere in any way with the delivery of health benefits to Ms. Golinski's wife on the basis of her sex or sexual orientation." *Id.* at 963–64.[2]

On December 17, 2009, the Blue Cross and Blue Shield Association filed a petition for review of the November 19, 2009 Order with the Judicial Council of the Ninth Circuit, arguing that "the Judicial Council has no jurisdiction over [the Association] under the EDR Plan" and that, in any event, Chief Judge Kozinski's conclusion that the FEHBA permits enrollment of same-sex spouses was incorrect. *See* Petition for Review for Blue Cross and Blue Shield Association at 1, 9, *In re Golinski*, No. 09-80173 (9th Cir. Dec. 17, 2009). On December 22, 2009, Chief Judge Kozinski issued a third order in this matter, stating that the time for appealing his prior orders had expired; that OPM and the AOUSC had not appealed; and that, accordingly, his orders were "final and preclusive on all issues decided therein as to [the AOUSC and OPM]." *Golinski*, No. 09-80173, at 1.

## II.

In order to determine whether OPM is bound by the directives in the November 19, 2009 Order, we first must determine the nature of Chief Judge Kozinski's authority in issuing that Order. There is no doubt that federal judges exercising judicial power in resolving cases or controversies pursuant to Article III of the Constitution can issue directives to executive branch agencies.[3] But not all actions by federal judges are of

---

[2] The November 19, 2009 Order also directed the Blue Cross Plan to "enroll Ms. Golinski's wife within 30 days of receipt of the appropriate forms from the [AOUSC], without regard to her sex or sexual orientation," and ordered certain retrospective relief for Ms. Golinski, including relief under the Back Pay Act, 5 U.S.C. § 5596. *Golinski*, 587 F.3d at 963–64.

[3] *See* U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)

this kind, and it is our view that, in presiding over the Golinski matter, Chief Judge Kozinski was acting in an administrative capacity.[4] Accordingly, when he issued the November 19, 2009 Order, Chief Judge Kozinski was not exercising the Article III authority to resolve a case or controversy, and thus cannot rely on that authority in purporting to direct OPM.

The background to the administrative process established by the Ninth Circuit EDR Plan makes clear why this is so. For much of the nation's history, the Executive Branch was responsible for the administration of the federal courts. *See* Gordon Bermant & Russell R. Wheeler, *Federal Judges and the Judicial Branch: Their Independence and Accountability*, 46 Mercer L. Rev. 835, 854–55 (1995). In 1939, however, Congress enacted legislation transferring the authority to administer the courts from the Department of Justice to the newly created AOUSC, which would operate under the direction and supervision of the forerunner to the Judicial Conference of the United States. *See* Pub. L. No. 76-299, § 304(1), 53 Stat. 1223, 1223; 28 U.S.C. § 604 (2006); *see also* H.R. Rep. No. 76-702, at 4 (1939) ("The bill places the responsibility for judicial admin-

---

(in resolving "cases" and "controversies," it is the federal courts' "duty . . . to say what the law is"); *United States v. McHugh*, 528 F.3d 538, 540 (7th Cir. 2008) ("[T]he 'judicial Power of the United States' is a power to make binding decisions, not to make suggestions that the Executive Branch may accept or reject." (citing *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792))).

[4] *See Mistretta v. United States*, 488 U.S. 361, 404 (1989) (power wielded by judges serving on U.S. Sentencing Commission "is not judicial power; it is administrative power derived from the enabling legislation"); *United States v. Ferreira*, 54 U.S. (13 How.) 40, 47–48 (1852) (statute authorizing federal district judges to adjust claims made against the United States, subject to approval of the Secretary of the Treasury, conferred power that was "not judicial . . . in the sense in which judicial power is granted by the Constitution to the courts of the United States"); *see also Mistretta*, 488 U.S. at 388 (observing that circuit judicial councils, the Judicial Conference of the United States, the Rules Advisory Committees, and the AOUSC, "some of which [entities] are comprised of judges, . . . do not exercise judicial power in the constitutional sense of deciding cases and controversies, but they share the common purpose of providing [through administration and rulemaking] for the fair and efficient fulfillment of responsibilities that are properly the province of the Judiciary"); *Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S. 74, 86 n.7 (1970) (characterizing circuit judicial councils as "administrative bodies"); *cf. Forrester v. White*, 484 U.S. 219, 228 (1988) ("Administrative decisions, even though they may be essential to the very functioning of the courts," are not "judicial acts" for purposes of determining judicial immunity from suit).

istration where it belongs—with the judiciary[.]"). That legislation also created the circuit judicial councils, charging them with taking action on reports submitted by the Director of the AOUSC. *See* Pub. L. No. 76-299, § 306, 53 Stat. at 1224; *see also* 28 U.S.C. § 332(d)(1) (2006) ("Each judicial council shall make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit."). With some adjustments, this statutory regime has remained in place to the present day.

In 1978, Congress enacted the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, which creates "an integrated scheme of administrative and judicial review" "for evaluating adverse personnel actions against federal employees." *United States v. Fausto*, 484 U.S. 439, 443, 445 (1988) (internal quotation marks and brackets omitted). The CSRA, however, affords no review rights to members of the "excepted service"—a category that at present includes all employees of the Judiciary and Congress. *See Dotson v. Griesa*, 398 F.3d 156, 163–65, 173 n.10 (2d Cir. 2005); *Blankenship v. McDonald*, 176 F.3d 1192, 1195 (9th Cir. 1999); *Lee v. Hughes*, 145 F.3d 1272, 1275 (11th Cir. 1998). Indeed, when the CSRA was enacted, those two branches managed their workplaces unconstrained by a number of statutes and other legal authorities applicable to private sector and executive branch employees. In 1980, the Judicial Conference partially filled this gap by developing a model EEO plan and requiring federal courts to adopt EEO plans of their own. *See Dotson*, 398 F.3d at 172. These EEO plans put into more concrete form the prior judicial policy of "'follow[ing] the equal employment opportunity principles applicable to private sector and government employers.'" *Id.* (quoting Report of the Judicial Conference of the United States, *Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995*, at 6 (1996) ("CAA Report")).

In 1995, Congress enacted the Congressional Accountability Act ("CAA"), which extended to congressional employees the protections of various workplace laws applicable to other public and private sector employees. *See* 2 U.S.C. § 1302(a) (2006). The Executive Branch has no enforcement authority under the CAA, *see id.* § 1361(f)(3); instead, the Act vests such authority in an Office of Compliance ("OOC") established within the legislative branch, *see id.* § 1381. Congressional employees with grievances arising under the CAA must first complete counseling

and mediation; following that, they may initiate proceedings with the OOC (or file a civil action in federal district court) and then seek judicial review of final OOC decisions. *See id.* §§ 1401–1408.

As the Second Circuit has explained, Congress considered bringing judicial employees within the ambit of the CAA, but ultimately did not do so. *See Dotson*, 398 F.3d at 173. "Instead, Congress required the Judicial Conference to prepare a report 'on the application to the judicial branch' of the labor laws in question, including 'any recommendations the Judicial Conference may have for legislation to provide to employees of the judicial branch the rights, protections, and procedures under the [labor] laws, including administrative and judicial relief, that are comparable to those available to employees of the legislative branch under [the CAA].'" *Id.* (quoting 2 U.S.C. § 1434 (2006)). The report submitted by the Judicial Conference concluded that no legislation was "necessary []or advisable in order to provide judicial branch employees with protections comparable to those provided to legislative branch employees under the CAA." CAA Report at 2. The report justified this recommendation by pointing to the Judiciary's "internal governance system," which it described as "a necessary corollary to judicial independence." *Id.* at 4. The report also discussed supplementing the Judiciary's existing administrative apparatus with a new "dispute resolution process" that would "expand upon existing judicial branch procedures by enhancing the hearing process and providing for appeal of the hearing officer's decision." *Id.* at 7. Reflecting the administrative nature of the proposed process, the report likened it to the procedures that "Congress has adopted in establishing the Office of Compliance." *Id.*

In 1997, the Judicial Conference issued a model EDR plan, which substituted a new set of complaint procedures for those in the model EEO plan but otherwise left much of the substance of that prior plan intact. *See Dotson*, 398 F.3d at 175. The model EDR plan instructed "each court [to] adopt and implement a plan based [on the model]," Judicial Conference of the United States, Model Employment Dispute Resolution Plan at 1 (Mar. 1997), and the Judicial Council of the Ninth Circuit did so the following year.

Consistent with the recommendations in the Judicial Conference's report, Congress did not enact any legislation providing for administrative

or judicial review of adverse employment decisions involving judicial employees. *See Dotson*, 398 F.3d at 175. The Second Circuit has described "Congress's decision to exclude judicial branch employees from the administrative and judicial review procedures of the CSRA, and from subsequent legislation such as the CAA," as "a conscious and rational choice made and maintained over the years in light of both a proper regard for judicial independence and recognition of the judiciary's own comprehensive review procedures for adverse employment actions, including review by judicial officers." *Id.* at 176.

Thus, as its history shows, the Ninth Circuit EDR Plan creates an administrative process—akin to the CAA process, albeit without express statutory authorization—designed to handle personnel-related matters within the Judicial Branch. The federal courts themselves have characterized their EDR processes in this way. For example, the Second Circuit has described the EDR process as "administrative review within the judiciary." *Id.*[5] And in the November 19, 2009 Order, Chief Judge Kozinski similarly acknowledged that the EDR plan is "part of the tradition of decentralized administration and local management of the federal courts." *Golinski*, 587 F.3d at 958 n.1.

## III.

We conclude that the directives in the November 19, 2009 Order do not legally bind OPM because Chief Judge Kozinski, acting in an administrative capacity under the Ninth Circuit EDR Plan, lacked legal authority to direct OPM in its administration of the FEHBP. We assume—as is stressed throughout the November 19, 2009 Order and suggested above— that federal courts have a legal basis for establishing an administrative process for the resolution of employment disputes involving judicial employees. *See Golinski*, 587 F.3d at 961–63; *supra* pp. 30–33. Such

---

[5] Although the Second Circuit in *Dotson* noted a "long history of *judicial review* within the courts' EEO plans," 398 F.3d at 176 n.14 (emphasis added), we believe that the court's use of the term "judicial review" was intended only to point out that internal, administrative review within the judiciary will often be overseen by officials who are, in fact, federal judges. *See id.* ("Indeed the judiciary is unique among the branches of government in being able to provide for itself some review of its *administrative* employment decisions by a judicial officer." (emphasis added)).

authority may be implicit in various statutory sources, *see, e.g.*, 28 U.S.C. § 332(d)(1) (establishing judicial councils); *id.* §§ 41–49 (establishing federal courts of appeals), or it may be incident to the federal courts' inherent Article III power "to provide themselves with appropriate instruments required for the performance of their duties."[6] But we have been unable to identify any support—whether in the Constitution, the U.S. Code, the Code of Federal Regulations, or the case law—for the specific proposition that the federal courts have the authority to establish an internal administrative dispute resolution process that can direct OPM's administration of the FEHBP. Rather, the relevant legal materials support the contrary conclusion.

## A.

The November 19, 2009 Order suggests that Congress has statutorily empowered the federal courts to establish EDR tribunals that can direct OPM in its administration of the FEHBP. *See Golinski*, 587 F.3d at 961 ("Ordering enrollment is proper and within my jurisdiction because Congress intended this tribunal to be the sole forum for adjudicating complaints of workplace discrimination by employees of the Judiciary. With that responsibility must come power equal to the task."). We respectfully disagree.

In determining whether Congress has delegated certain authority to an administrative actor, the general rule is that the delegation must be either "explicit" or "*fairly . . .* implied" by a statute. *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 666 n.6 (D.C. Cir. 1994) (en banc); *see also Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 674 (D.C. Cir. 1973) ("The extent of [an agency's] powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background."). The November 19, 2009 Order does not identify, and we are unaware of, any statute that explicitly empowers a judicial officer presiding over an EDR hearing to control OPM's

---

[6] *Ex parte Peterson*, 253 U.S. 300, 312 (1920); *see also* CAA Report at 4 ("The judiciary's internal governance system is a necessary corollary to judicial independence."); Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735, 742 (2001) ("Any Anglo-American 'court,' to be worthy of that name, must have the ability to . . . regulate its internal administrative affairs[.]").

administration of the FEHBP. Nor, in our view, is there anything in those statutes potentially relevant to the service of judicial officers in that capacity that can be "fairly" read to authorize the exercise of such control over OPM. It is true that 28 U.S.C. § 332 empowers the judicial council of each circuit to "make all necessary and appropriate orders for the effective and expeditious administration of justice *within* its circuit." 28 U.S.C. § 332(d)(1) (emphasis added). But there is no basis for concluding that the councils' authority to issue orders for internal administration also encompasses the issuance of orders empowering EDR hearing officers to direct executive branch agencies. Indeed, there are affirmative indications that Congress did not intend for judicial officers serving in an administrative role to be able to exercise such directive authority, at least with respect to OPM's administration of the FEHBP.

To begin with, the FEHBA contains no suggestion that the federal courts, as employing agencies operating in an administrative capacity, are to have directive authority over OPM. The FEHBA specifically entrusts OPM with administering the FEHBP. *See Transitional Learning Cmty. at Galveston, Inc. v. OPM*, 220 F.3d 427, 429 (5th Cir. 2000); *Kobleur v. Group Hospitalization & Med. Servs., Inc.*, 954 F.2d 705, 709 (11th Cir. 1992). In particular, the FEHBA authorizes OPM to negotiate and contract with private insurance carriers to offer health benefits plans to federal employees—including judicial employees—and other eligible individuals, *see* 5 U.S.C. §§ 2104, 2105, 8901, 8902(a), 8903 (2006), and to determine if carriers are contractually obliged to pay benefits to enrollees for particular services, *see id.* § 8902(j). The FEHBA also authorizes OPM to "prescribe regulations necessary to carry out" the Act, *id.* § 8913(a), which regulations may specify the "time at which and the manner and conditions under which an employee is eligible to enroll in an approved health benefits plan," *id.* § 8913(b). Finally, the FEHBA specifically vests jurisdiction to review claims challenging OPM's administration of the FEHBP in the U.S. district courts and the U.S. Court of Federal Claims, which have concurrent jurisdiction "of a civil action or claim against the United States founded on [the Act]." *Id.* § 8912. There is no provision of the FEHBA expressly granting any administrative entity—including one within the Judicial Branch—a role in reviewing any actions taken by OPM in administering the FEHBP—including actions taken with respect to enrollment. *Cf. Rosano v. Dep't of the Navy*, 699 F.2d 1315,

1319 (Fed. Cir. 1983) (stating that the Navy, as the employing agency, "had no power to change" "FEHB[P] options[] determined by OPM"); *In re Levenson,* 587 F.3d 925, 934 (9th Cir. 2009) (observing that FEHBA vests authority to enter into health insurance contracts for federal employees "in a single executive agency, OPM" and that it would not be appropriate to issue an order directing the Office of the Federal Public Defender for the Central District of California ("FPD") "to enter into separate contracts [for its employees] with private insurers" because "[n]o statute or regulation authorizes the FPD to enter into [such contracts] or to bind the United States to any such contract").

Consistent with our reading of the FEHBA, nothing in OPM's regulations implementing the Act indicates that OPM delegated to employing agencies the authority to direct OPM in its administration of the FEHBP. It is true that regulations promulgated by OPM give an employee's "employing office" the authority to make initial enrollment determinations and also require the employing agency to make an internal reconsideration process available to an employee denied coverage by his employing office. *See* 5 C.F.R. § 890.104 (2009). The regulations further provide that "[a]fter reconsideration, the [employing] agency . . . must issue a final decision," *id.* § 890.104(e), and make that final decision subject to judicial review, *see id.* § 890.107(a). Thus, at least to some extent, OPM appears to have delegated to the relevant employing agencies the authority to make initial enrollment decisions; to reconsider those decisions; and to render them final, subject to judicial review. *Cf. id.* § 890.103(b) ("OPM may order correction of an administrative error upon a showing satisfactory to OPM that it would be against equity and good conscience not to do so.").[7] But nothing in the regulations may be read to suggest that an employing agency can, in internally reconsidering an enrollment denial, issue a directive to OPM that binds it with respect to that enrollment, including by preventing OPM from taking actions otherwise authorized by statute.

---

[7] We do not address here whether the relevant statutory authorities justify construing this delegation to extend to employing entities within the Judicial Branch. *See Authority of OPM to Direct FEHB Program Carrier Not to Enroll Individual*, 34 Op. O.L.C. at 56 n.3.

Notwithstanding the terms of the FEHBA, the November 19, 2009 Order suggests that the statutory authority to issue directives to OPM is implicit in Congress's decision to make "the Judiciary's EDR tribunals . . . the only forum where judicial employees may seek redress for unlawful personnel actions." *Golinski*, 587 F.3d at 961; *see also id.* ("If a judicial employee suffers an unjustified personnel action, such as being fired on account of race, sex or religion, the only remedy possible would come from an EDR tribunal. Our EDR tribunals must therefore have the authority to grant full relief, including reinstatement (or other prospective relief) and back pay."). We do not believe, however, that the recognition of such implicit authority is warranted. Not only does the FEHBA itself contain no indication that such authority exists, but it also would be at odds with the Act's framework for OPM administration of the FEHBP, which is subject to expressly authorized judicial review. In particular, as noted, *see supra* p. 35, Congress has established the federal district courts and the Court of Federal Claims as the proper venues for challenging OPM's administration of the FEHBP. *See* 5 U.S.C. § 8912; *see also Nat'l Treasury Employees Union v. Campbell*, 589 F.2d 669, 674 (D.C. Cir. 1978) (section 8912 "is . . . a broad consent to all suits brought to enforce rights and obligations created by the [FEHBA]"). Thus, although the November 19, 2009 Order contends that "judicial employees who are victims of discrimination . . . have no remedy at all" other than through the EDR process, *Golinski*, 587 F.3d at 961, in fact the federal courts are available to review challenges to OPM's actions relating to enrollment. That specific provision for judicial review indicates that Congress did not contemplate that the federal courts' internal administrative dispute resolution processes would also provide a means of reviewing—and then countermanding by issuance of a binding directive—OPM's enrollment-related actions.

Moreover, the fact that Congress *has* expressly authorized at least one remedy—back pay—that judicial officers acting in an administrative capacity may make available to judicial employees subjected to adverse employment actions further suggests that Congress did not also intend such officers to be able to issue an order to OPM directing enrollment in an FEHBP plan. Specifically, the Back Pay Act provides that an employee

> who, on the basis of . . . an administrative determination . . . is found by appropriate authority . . . to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee . . . is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect . . . an amount equal to all or any part of the pay, allowances, or differentials, as applicable which the employee normally would have earned or received during the period if the personnel action had not occurred . . . .

5 U.S.C. § 5596(b)(1). The Back Pay Act does not define in detail the nature of the "authority" that must make the findings justifying relief, other than specifying that it must be "appropriate." The Act does, however, expressly include judicial employees within its ambit. *See id.* § 5596(a)(2); 28 U.S.C. § 610 (2006). Accordingly, the process established by the Ninth Circuit EDR Plan, which identifies relief under the Back Pay Act as one of the remedies available to successful complainants, may well qualify as an "appropriate authority." *See* Ninth Circuit EDR Plan at 10; *see also In re Levenson*, 587 F.3d at 935. But whether it does or not, the Back Pay Act at least demonstrates that Congress knows how to authorize particular remedies for judicial employees subjected to discriminatory treatment and to grant the Judicial Branch a means of remedying such wrongs. That Congress has not taken similarly explicit steps to empower the federal courts to establish administrative processes that can bind OPM in the administration of the FEHBP suggests strongly that Congress did not intend to implicitly authorize them to do so.

The November 19, 2009 Order also invokes two other potential sources of statutory authority for the directives to OPM. First, it suggests that an EDR hearing officer's power to direct OPM is implicit in the express statutory authority of the Merits System Protection Board ("MSPB") to bind executive branch agencies in parallel situations involving executive branch employees. *See Golinski*, 587 F.3d at 961 n.4 (noting that had the January 13, 2009 Order "come from the MSPB, there would have been no question that it would have had to be obeyed," and positing that because "[o]ur EDR tribunals take the place of the MSPB for judicial employees, . . . it makes sense that Congress gave our EDR tribunals powers coexten-

sive with those of the MSPB" (citing 5 U.S.C. § 1204(a)(2) (2006)). Second, the November 19, 2009 Order suggests that the Administrative Office of the United States Courts Personnel Act of 1990 ("AOUSC Personnel Act"), Pub. L. No. 101-474, 104 Stat. 1097, which transferred control over the AOUSC's personnel matters from the Executive Branch to a personnel system within the AOUSC, may constitute implicit congressional recognition of the Judiciary's authority to exercise the same powers as the MSPB. *See Golinski*, 587 F.3d at 962 n.6. In our view, however, neither the MSPB's express statutory authority to issue binding orders nor the AOUSC Personnel Act may fairly be read to confer the authority that is at issue in this matter.

With respect to the MSPB, it is not even clear that the Board may review a challenge to OPM's enrollment decisions under the FEHBA. The MSPB's jurisdiction is restricted to actions made "appealable to the Board under any law, rule, or regulation," 5 U.S.C. § 7701(a) (2006), and there does not appear to be any legal authorization for the appeal of OPM enrollment decisions to the Board, *see* 5 C.F.R. 1201.3 (2009) (enumerating actions that may be appealed to the MSPB); *see also Rosano*, 699 F.2d at 1318–20 (MSPB lacks jurisdiction to review challenge to OPM decision to approve or not approve health plan); *Oppenheim v. OPM*, 51 M.S.P.R. 255, 257 (1991) (OPM's "decisions concerning its administration of health benefits are not reviewable by the [MSPB]"); *Lee v. OPM*, 32 M.S.P.R. 149, 152 (1987) (same). In any event, there is no support for the assumption that the MSPB and an EDR hearing officer have "coextensive" statutory authority over executive branch agencies, *Golinski*, 587 F.3d at 961 n.4. Congress expressly granted the MSPB "special power" to compel such agencies to comply with its orders and decisions. *Kerr v. Nat'l Endowment for the Arts*, 726 F.2d 730, 732 (Fed. Cir. 1984); *see* 5 U.S.C. § 1204(a)(2) ("The [MSPB] shall . . . order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order."); *cf.* 42 U.S.C. § 2000e-16(b) (2006) (providing that "[t]he head of each . . . department, agency, or unit shall comply with . . . rules, regulations, orders, and instructions" issued by the Equal Employment Opportunity Commission). By contrast, there is no equivalent provision authorizing the establishment of judicial EDR processes that can do the same. In accord with basic principles of statu-

tory construction, *see Leatherman v. Tarrant County Narcotics Intel. & Coord. Unit*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusio alterius*."), the absence of such a provision indicates that the potential functional similarity between the MSPB and a federal court's EDR process does not itself justify the inference that Congress intended for them to have the same enforcement powers. Thus, whether or not it would "make[] sense" for the Ninth Circuit EDR process to be able to bind executive branch agencies in the same manner as the MSPB can, *Golinski*, 587 F.3d at 961 n.4, Congress has not acted to make it so. *See Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 38 (1934) ("The question of policy—whether different terms should have been imposed—is not for us. We may not add to the conditions set up by Congress any more than we can subtract from them.").

The AOUSC Personnel Act also fails to provide a legal basis for the directives to OPM. In the first place, that Act by its terms addresses solely personnel matters within the AOUSC and thus does not speak to such matters within the federal courts generally. Moreover, the text of the AOUSC Personnel Act contains no language expressly conferring on the AOUSC the authority to issue directives to OPM in its administration of the FEHBP, and none may be fairly implied. Indeed, the House Committee Report makes clear that the Act affects neither the entitlement of the AOUSC's employees to health benefits under the FEHBP nor OPM's responsibility for hearing those employees' administrative appeals of its decisions under the FEHBA. *See* H.R. Rep. No. 101-770, pt. 1, at 6 (1990) ("Being subject to the retirement and insurance plans administered by [OPM], employees of the [AOUSC] will continue to appeal adverse rulings on these matters to [OPM]").

The November 19, 2009 Order notes that section 3(g) of the AOUSC Personnel Act, § 3(g), 104 Stat. 1099, empowers the AOUSC to exercise, with respect to employees or applicants for employment in the AOUSC, "any authority granted" to the MSPB under "any law prohibiting" certain enumerated forms of "discrimination in Federal employment." 28 U.S.C. § 602 note (2006). But this provision does not grant even the AOUSC the authority to direct OPM as the November 19, 2009 Order purports to do. The Order is clear that the directives to OPM are for the purpose of enforcing the non-discrimination protections set forth in the Ninth Circuit's own internal EDR and EEO plans, not any federal anti-discrimination

statute. *See Golinski*, 587 F.3d at 963 ("This court's non-discrimination plan requires that Ms. Golinski be afforded [FEHBP coverage for her spouse]"). Accordingly, even if the MSPB could direct OPM's actions with respect to enrollment in the FEHBP—which, as noted above, is not at all clear, *see supra* p. 39—we would not read section 3(g) as authorizing the AOUSC to do likewise when it is enforcing only an internal judicial rule and not a federal statute that actually grants such power to the MSPB.[8]

---

[8] The Ninth Circuit EDR Plan itself is consistent with our view that there is no statutory authority for the directives to OPM contained in the November 19, 2009 Order and that those directives are therefore without legal force. Although the November 19, 2009 Order characterized the EDR plan as "clear[ly]" authorizing the issuance of legal directives to OPM, *Golinski*, 587 F.3d at 961, the plan by its terms provides that only judicial actors may be named as respondents in grievance proceedings, *see* Ninth Circuit EDR Plan at 7 ("The respondent in all complaints shall be the employing office that would be responsible for redressing, correcting or abating the violations(s) alleged in the complaint"), thus suggesting that the plan does not anticipate the issuance of binding orders to outside actors. *See Hansberry v. Lee*, 311 U.S. 32, 40 (1940) (as a general matter, "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process"); 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3033 (3d ed. 1997) ("Ordinarily a judgment only may be enforced against a party.") ("Wright, Miller & Marcus"). In addition, while the plan provides that hearing officers "may order a necessary and appropriate remedy," including one "prospectively insuring compliance with the rights protected by this Plan," Ninth Circuit EDR Plan at 9, the only remedies listed as available to successful complainants apply solely within the Judicial Branch. For example, available remedies include placement of an employee in a position previously denied or in a comparable alternative position, prospective promotion to a position, priority consideration for a future promotion or position, granting of family and medical leave, and payment of back pay. *See id.* at 9–10. Finally, the EDR plan states that it "provide[s] rights and protections to Ninth Circuit employees comparable to those provided to legislative branch employees under the CAA," Ninth Circuit EDR Plan at 1, and the CAA plainly establishes an internal process for the resolution of disputes between congressional employees and their employing offices concerning the application of enumerated, generally applicable workplace statutes. *See Johnson v. Office of the Architect of the Capitol*, No. 99-AC-326, 2003 WL 25795028, at *2 (C.A.O.C. 2003) (CAA was "promulgated to ensure that *employing offices in Congress and its instrumentalities* are accountable for actions taken in contravention of statutes made applicable by the Act" (emphasis added)). There is no suggestion in the CAA that the OOC's enforcement functions under that Act include the power to direct executive action—a power that would be quite anomalous in any event since the Executive Branch has no authority under the Act to enforce the incorporated workplace statutes with respect to congressional employees, *see*

## B.

Were the EDR process within the Executive Branch, we could end our inquiry with the conclusion that a judge presiding over that process lacks statutory authority to issue orders directing OPM in its administration of the FEHBP. It is well-settled that "an agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it"); *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 322 (1961) ("[The Civil Aeronautics Board] is entirely a creature of Congress and the determinative question is not what the Board thinks it should do but what Congress has said it can do."); 5 U.S.C. § 558(b) (2006) ("A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law.").[9] Given that the EDR process is a creation of the

2 U.S.C. § 1361(f)(3). *See also Eastham v. U.S. Capitol Police Bd.*, No. 06-CP-41, 2008 WL 5476087, at *5 (C.A.O.C. 2008) (OOC Board "has no mandate or plenary authority under the CAA to remedy abuses or police the integrity of the [Federal Employees' Compensation Act] process"). Thus, although it is true that the directives to OPM contained in the November 19, 2009 Order do not constitute a type of remedy expressly foreclosed by the plan, s*ee* Ninth Circuit EDR Plan at 10 (identifying payment of attorney's fees and payment of compensatory and punitive damages as "[r]emedies *not* legally available"), the availability of such an externally directed remedy would appear at odds with the entire structure of the plan, including those remedies that it does expressly make available.

[9] This Office has noted a possible argument that, because "Congress is presumed to have made its statutory scheme effective," "agencies *may* possess *some* inherent power to impose sanctions designed to protect the integrity of their proceedings[,] . . . even against federal agencies." *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply with Orders Issued by EEOC Administrative Judges*, 27 Op. O.L.C. 24, 32 (2003). Whatever the merits of this argument, it is of no relevance here because the authority of an EDR hearing officer to direct OPM would extend well beyond the type of "authority to promulgate an internal disciplinary rule" that some courts have recognized as inherently possessed (presumably, because implicitly delegated by statute) by administrative bodies. *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 7 (D.C. Cir. 2000); *see, e.g.*, *Touche Ross & Co. v. SEC*, 609 F.2d 570, 582 (2d Cir. 1979) (upholding SEC rule providing for Commission to suspend and disbar attorneys who appear before it "as a necessary adjunct to the Commission's power to protect the integrity of its administrative procedures and the public in general"); *cf. Am. Bus. Ass'n*, 231 F.3d at 7 (any inherent authority possessed by administrative agencies

Judicial Branch, however, we must address a possible constitutional basis for the directives to OPM contained in the November 19, 2009 Order.

Pointing to OPM's actions in this matter—specifically, its advice to the Blue Cross and Blue Shield Association that federal law barred the Blue Cross Plan from accepting Ms. Golinski's election form, *see Golinski*, 587 F.3d at 958—the November 19, 2009 Order asserts that OPM "may not disregard a coordinate branch's construction of the laws that apply to its employees," and "must henceforth respect the Judiciary's interpretation of the laws applicable to judicial employees." *Id.* at 961. "Any other result," the Order contends, "would prevent the Judiciary from 'accomplishing its constitutionally assigned functions' by seriously undermining [its] autonomy over personnel matters." *Id.* (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977); citation omitted); *see also id.* ("Barring us from determining, within reasonable bounds, the rights and duties of our personnel under the laws providing for their employment would make us a handmaiden of the Executive." (internal quotation marks omitted)). On this basis, the Order suggests that the Constitution grants judges serving as EDR hearing officers the inherent authority to issue orders that bind executive branch agencies in their administration of statutes that confer benefits on judicial employees. *See Golinski*, 587 F.3d at 963 (invoking "the Judiciary's inherent authority to resolve workplace complaints without interference by the Executive"); *id.* at 962 n.6 (discussing federal courts' "authority, part statutory and part inherent, to control matters that touch on the operation of the courts").

Particularly given that the statutory context strongly indicates that Congress has both declined to empower EDR hearing officers generally in this manner and charged OPM specifically with administering the FEHBA, we conclude that there is no inherent constitutional power supporting the directives issued to OPM in this matter. Even assuming that federal courts possess inherent authority under Article III, independent of any statute, to create an administrative process for the resolution of judicial employment disputes, such inherent authority to establish mecha-

does not extend to "modifying regulated parties' primary conduct"). Indeed, the argument based on an agency's inherent authority to protect the integrity of its proceedings is particularly inapt in this case because OPM was not even a party to Ms. Golinski's EDR hearing, and thus not part of the "proceeding" over which Chief Judge Kozinski presided.

nisms for internal enforcement of employment rules does not imply the much more significant authority to act with binding force against an executive branch agency that has been statutorily charged with the administration of a federal benefits program.

The Supreme Court has explained that inherent powers are those "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quotation marks and citation omitted); *see also United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812) ("Certain implied powers must necessarily result to our Courts of justice from the nature of their institution."). As the Supreme Court has explained, "[p]rinciples of deference counsel restraint in resorting to inherent power, and require its use to be a reasonable response to the problems and needs that provoke it." *Degen v. United States*, 517 U.S. 820, 824 (1996) (internal citations omitted); *see also Chambers*, 501 U.S. at 44 (directing that "inherent powers must be exercised with restraint and discretion"). Consistent with this admonition, the Court has identified a limited number of areas in which federal courts possess inherent powers, *see generally* Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735, 738 (2001), none of which powers are comparable to the one claimed here.

It is true that Article III courts possess the inherent "ability to punish disobedience to *judicial* orders." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987) (emphasis added). But that authority—"essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches," *id.* at 796–97—says nothing about the authority of federal judges to compel compliance with their *administrative* orders. "Courts of justice" must "be vested, by their very creation, with power to impose . . . submission to their lawful mandates." *Chambers*, 501 U.S. at 43. But we are not aware of any support for the proposition that federal judges presiding over an administrative process for the Judicial Branch—not a judicial proceeding to resolve a case or controversy—must have this power as well, particularly when the entity to which the order is directed is not a party to that administrative process, *cf. Hansberry*, 311 U.S. at 40; Wright, Miller & Marcus § 3033; *supra* note 9.

In fact, we have identified no precedent for the proposition that the Constitution vests federal courts with the inherent authority to establish an administrative process pursuant to which a judge can direct an executive branch agency in these circumstances. Indeed, as the historical discussion above demonstrates, *see supra* Part II, the Executive Branch governed all judicial administration until 1939, and was in charge of personnel matters for some judicial employees—those within the AOUSC—until enactment of the AOUSC Personnel Act in 1990. *See Dotson*, 398 F.3d at 171 & nn.6, 7. And, as previously discussed, *see supra* pp. 40–41, even in granting the AOUSC control over its own personnel matters in most respects, Congress decided to leave OPM in charge of administering a number of retirement and insurance programs, including the FEHBP, with respect to the AOUSC's employees. *See* H.R. Rep. No. 101-770, pt. 1, at 6. Thus, there is no longstanding tradition of the federal courts exercising complete independence in the administration of judicial employees generally, let alone in the administration of their federal benefits.

Admittedly, there is some support in the CAA Report submitted by the Judicial Conference and the legislative history of the AOUSC Personnel Act for the proposition that certain kinds of Executive Branch interference with a personnel issue that is strictly internal to the Judicial Branch—in other words, that concerns solely the relationship between the Judiciary and its employees—might raise separation of powers concerns. *See* CAA Report at 15 ("The judicial branch needs internal enforcement [of workplace laws]" "due to separation of powers concerns"); H.R. Rep. No. 101-770, pt. 1, at 5 ("While it may be convenient to have the personnel system of [the AOUSC] covered by the personnel management network of the executive branch, it is contrary to the doctrine of separation of powers."); *see also* CAA Report at 4 ("[T]he judicial branch must have control over its employee and workplace management in order to ensure both the independence, and the appearance of independence, of its decisions."). The enrollment of Ms. Golinski's spouse in the FEHBP, however, is not such a purely internal judicial matter. Not only is OPM responsible generally for administering the FEHBP, which is open to employees in all three branches, but it also contracts with the private insurance carriers that operate the program and administers the funds—held in the U.S.

Treasury—used to reimburse those carriers for benefit payments. *See* 5 U.S.C. §§ 8901, 8902, 8903, 8909.

Consistent with this judgment, we note that even in the years since the Judiciary has been managing its own internal personnel matters, it has not laid claim to the kind of directive authority at issue here. Thus, while "administrative review within the judiciary plainly has a long history, which has been well known to Congress," *Dotson*, 398 F.3d at 176, the directives in the November 19, 2009 Order appear to be without precedent. The *sui generis* nature of these directives supports the conclusion that the power claimed is not "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962); *see generally Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 252–57 (1891) (surveying practice of common law courts in concluding that federal courts do not possess inherent authority to order medical examinations of plaintiffs).

The absence of historical support for the proposition that the directives to OPM in the November 19, 2009 Order are constitutionally based is not surprising. The Supreme Court has adopted a functional approach to separation of powers disputes, rejecting "the notion that the three Branches must be entirely separate and distinct," *Mistretta*, 488 U.S. at 380, and emphasizing instead that the Constitution "'enjoins upon its branches separateness but interdependence, autonomy but reciprocity,'" *id.* at 381 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952)). Thus, there is nothing necessarily anomalous about the benefits received by one branch's employees being to some extent dependent on another branch's interpretation of the laws. *See id.* (explaining that the separation of powers does not require a "hermetic division among the Branches"). Indeed, the Court has been clear that "even quite burdensome interactions" "between the Judicial Branch and the Executive" do not "necessarily rise to the level of [unconstitutionality]." *Clinton v. Jones*, 520 U.S. 681, 702 (1997).

To be sure, "'the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties,'" *Jones*, 520 U.S. at 701 (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)), and in resolving disputes involving alleged encroachments upon

the Judiciary, the Court specifically has identified the danger of another branch "'impermissibly threaten[ing] the institutional integrity of the Judicial Branch,'" *Mistretta*, 488 U.S. at 383 (quoting *Commodity Futures Comm'n v. Schor*, 478 U.S. 833, 851 (1986)). In our view, however, no such threat is present here. OPM's actions relating to the attempted enrollment of Ms. Golinski's spouse simply do not "destroy [the Judicial Branch's] autonomy," *Golinski*, 587 F.3d at 962, or otherwise seriously undermine its institutional integrity or its ability to perform its duties.[10] Prior precedent of this Office addressing the permissibility of executive enforcement of federal legislation with respect to the Judiciary comports with this conclusion. *See, e.g.*, *Enforcement of INA Employer Sanctions Provisions Against Federal Government Entities*, 24 Op O.L.C. 33, 37 (2000) (concluding that separation of powers does not bar enforcement by the Immigration and Naturalization Service of certain employer verification requirements against a judicial employer); Memorandum for Theodore M. Cooperstein, Counsel to the Deputy Attorney General, from Noel J. Francisco, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: FBI Investigative Authority* at 2 (June 7, 2004) ("[T]here is no general separation-of-powers problem with the FBI exercising the Executive's authority to enforce the laws by investigating possible violations of the law that may involve the property, activities or employees of the legislative or judicial branches.").

The relevant Supreme Court precedents do not specify with complete precision those functions that are so central to the autonomy of the Judicial Branch that they must be immune from interference by the other branches, but it has marked some helpful guideposts. Most fundamentally, as the Court has explained, "[a] Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches

---

[10] The November 19, 2009 Order presents some hypothetical examples of Executive Branch action. *See Golinski*, 587 F.3d at 962. Since those situations have not come to pass, we do not consider them in undertaking our separation of powers analysis of OPM's conduct with respect to Ms. Golinski's attempted enrollment of her spouse. *See Schor*, 478 U.S. at 852 (declining to endorse an absolute, separation of powers based prohibition on congressional action "out of fear of where some hypothetical 'slippery slope' may deposit us"); *see also Mistretta*, 488 U.S. at 411 n.32 (declining to address "hypothetical constitutional question").

of government." *United States v. Will*, 449 U.S. 200, 217–18 (1980). Thus, the coordinate branches may not interfere with the "total and absolute independence of judges in deciding cases or in any phase of the decisional function." *Chandler*, 398 U.S. at 84. Certain specific constitutional provisions help to preserve the necessary judicial independence: in particular, the good Behavior Clause "guarantees that Art. III judges shall enjoy life tenure, subject only to removal by impeachment," and the Compensation Clause "guarantees Art. III judges a fixed and irreducible compensation for their services." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59 (1982) (plurality opinion); *see also United States ex rel. Toth v. Quarles*, 350 U.S. 11, 16 (1955); U.S. Const. art. III, § 1. The Court also has recognized several further constitutional protections afforded the Judiciary. Congress may not "vest review of the decisions of Article III courts in officials of the Executive Branch" or "command[] the federal courts to reopen final judgments." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995). In addition, Congress may not "authorize the adjudication of Article III business in a non-Article III tribunal" in a way that "impermissibly threatens the institutional integrity of the Judicial Branch." *Schor*, 478 U.S. at 851; *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985) ("Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." (citing *N. Pipeline Constr. Co.*, 458 U.S. at 84, 90–92 (plurality, concurring, and dissenting opinions))).

OPM's actions in this matter are not at all comparable, however, to the types of intrusions that the Court has deemed to transgress the separation of powers. Unlike in those cases, there is no connection here between the allegedly intrusive action—OPM's enforcement of the federal statutory bar on the enrollment of same-sex spouses of judicial employees in the FEHBP—and either the judicial decisionmaking process or any of the related activities that reside at the core of federal judicial power.[11] Some

---

[11] *See Enforcement of INA Employer Sanctions Provisions*, 24 Op O.L.C. at 37 (even though Executive Branch enforcement of immigration laws with respect to judicial employer "would impose some administrative burdens upon its subject[,] . . . such burdens would certainly not be so demanding as to interfere with the judiciary's proper

potential employees may decline to work for the Judiciary—and some current judicial employees may depart for the private sector—because of the unavailability of federal health benefits for same-sex spouses. But this outcome hardly establishes that the Executive Branch violates Article III when, in administering a government-wide benefits program such as the FEHBP, it acts to prevent the attempted enrollment of a judicial employee based on generally applicable statutory limits on the availability of benefits. *Cf. O'Malley v. Woodrough*, 307 U.S. 277, 282 (1939) (in concluding that Compensation Clause does not forbid subjecting federal judges to a generally applicable income tax, observing that "[t]o subject [federal judges] to a general tax is merely to recognize that judges are also citizens, and that their particular function in government does not generate an immunity from sharing with their fellow citizens the material burden of the government whose Constitution and laws they are charged with administering"); *United States v. Hatter*, 532 U.S. 557, 571 (2001) ("There is no good reason why a judge should not share the tax burdens borne by all citizens."). The application of statutorily prescribed limits on federal employee benefits of any kind may have this same consequence, and yet it cannot be the case that separation of powers principles completely disable the Executive Branch from applying any such limits to judicial employees. Indeed, as the Supreme Court held in *Will*, the Compensation Clause does not even "erect an absolute ban on all legislation that conceivably could have an adverse effect on the compensation of judges." 449 U.S. at 227; *see also id.* at 227 n.31 ("[T]he Compensation Clause does not forbid everything that might adversely affect judges."). If the Compensation Clause, which is an express constitutional limit, does not render the compensation of *judges* inviolable, then *a fortiori* general separation of powers principles do not afford the Judiciary absolute protection from action by the Executive Branch to enforce a statute that has some effect on the benefits received by judicial *employees*.

---

execution of its constitutional obligations"); *cf. Mistretta*, 488 U.S. at 410 (dismissing notion that the President's power to appoint federal judges to the U.S. Sentencing Commission and to remove Commission members for good cause threatens judicial independence or "prevent[s] the Judicial Branch from performing its constitutionally assigned function of fairly adjudicating cases and controversies").

Given all of these considerations, we are unconvinced that OPM's actions threaten the integrity of the Judicial Branch, particularly when compared with other alleged encroachments on that branch that the courts have upheld against separation of powers challenge.[12]

DAVID J. BARRON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[12] *See Mistretta*, 488 U.S. at 408–11 (upholding President's authority to appoint and remove members of U.S. Sentencing Commission, including federal judges); *Morrison v. Olson*, 487 U.S. 654, 683 (1988) (powers and duties of Judicial Branch with respect to independent counsel under Ethics in Government Act, including authority to terminate counsel's office, did not threaten institutional integrity of Judicial Branch); *see also United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir. 1984) (rejecting the claim that the Constitution confers on federal judges absolute immunity from federal criminal prosecution); *United States v. Hastings*, 681 F.2d 706, 711 (11th Cir. 1982) (same); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974) (same); *cf. Will*, 449 U.S. at 228–29 (Compensation Clause does not prevent Congress from refusing to apply previously enacted formula for increasing judicial salaries so long as increase has not taken effect as part of the compensation that is "due and payable").